## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

**HK EDGERTON,**
**WILLIAM C. MCRAE AKA "WILLIAM MAYHEM**
**THE PIRATE MAGICIAN OF ST. AUGUSTINE", and**
**JILL PACETTI**

**V.**                                    **Case No.  3:20-cv-941**

**CITY OF ST. AUGUSTINE, FLORIDA,**
**A MUNICIPALITY**

## PLAINTIFFS' COMPLAINT

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Come now the Plaintiffs, HK Edgerton, individually and as friend of the Court for the Plaza Cenotaph, Jill Pacetti, and William C. McRae  aka "William Mayhem the Pirate Magician of St. Augustine" ("William Mayhem") by and through counsel, and request the following injunctive and declaratory relief.

### JURISDICTION AND VENUE

1. This case arises under the First and Fourteenth Amendments to the Constitution of the United States as well as 42 U.S.C. § 1983 and presents a federal question within the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3) and 25 U. S. C. § 1302.    The Court

has the authority to issue a declaratory judgment under 28 U.S.C. 2201 and to provide injunctive relief and award nominal damages under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65.

2.   Venue is proper in the Middle District under 28 U.S.C. § 1931(B)(2), because all of the events or omissions giving rise to this claim herein.

### PARTIES

3.  Plaintiff, HK Edgerton, is a living historian who lives in Ashville, NC and is a descendant of a black confederate veteran.  He has a particularized injury in the removal of the Cenotaph because he is the only black descendant of a Confederate Veteran who often travels from his home in to take up a position beside the Cenotaph as a back drop in the open air museum of the Plaza to conduct living histories to the public, about Black Confederates. Mr. Edgerton derives income from living history events in public and private venues, and he asserts "taking away the Cenotaph from the Plaza" and removing it to "Timbuktu" eliminates one his regular public living history venues. Additionally, the taking of this Cenotaph, with its numerous non-Anglo names, takes away a 'teaching tool" depriving him of an historic exhibit that is a "Testament to the diversity of the southern armed forces including men who look like me" in the traditional Public Forum.   Mr. Edgerton also asserts constitutional rights violation including free expression of his religious expression, free speech and due process.   Mr. Edgerton attempted on several occasions in front of the Commission to obtain equal time to confront the claim that "it is a white supremacist monument" during the Contextualization and removal process, but was denied.    As a Christian and a veteran, Mr. Edgerton expresses his religious beliefs by paying respects to the dead by praying at, and protecting the empty tomb of his 'southern family'. See Exhibit "A" Finally, Mr. Edgerton's living histories include discussions of men who looked like him, especially including Alexander Darnes and Anthony

Welters from St. Augustine.  Mr. Edgerton wears a reproduction of a Southern soldier's gray uniform and carries a replica "Southern Cross" flag of the Southern armed forces, while standing by the Cenotaph.  His artful presentations including singing "Dixie" as he describes the Cenotaph as an "integrated monument" and expressing how black Confederates "earned a place of honor under this flag" and "this monument represents them".  This speech is unpopular speech in today's cancel culture, and Mr. Edgerton alleges it is the City's intentional desire to quash his public speech.  As a friend of the Cenotaph, Mr. Edgerton asserts that the Cenotaph speaks for itself and has done so for a century and a half.  Removing it is contrary to the expectation of permanence that those who erected and have utilized the Cenotaph, like himself, have with such a large, long-standing and important public historical resource.

4.  William C. McRae  aka "William Mayhem the Pirate Magician of St. Augustine is a historical re-enactor, theatrical performer and tour guide who derives one hundred percent of his income from the historical tourist industry, primarily in St. Augustine.   William Mayhem views the reputation of St. Augustine that it values and protects its history, as an asset to his business. Additionally, the Plaza Cenotaph is the only pubic historic resource in the City that relates to the "Civil War" period and St. Augustine's participation in it.  Mr. Mayhem utilizes the Cenotaph as part of his historical tours and, as such, it is a significant asset to his businesses. He stands to suffer economic injury if the asset is diminished through its elimination from the Plaza. He wishes to continue utilizing this public historical resource in the future.

5.  Jill Pacetti is a descendant of Estubio Pacetti, who was killed during the War Between the States, whose final resting place is known only to God, and who is one of the "OUR DEAD" memorialized on the Cenotaph.  Ms. Pacetti and her family have used the Cenotaph in lieu of a tombstone for their ancestor, and has used and wishes to continue using the Cenotaph at its location in the Plaza to freely exercise her Christian religious memorial expression.  She also

asserts that the City's removal act of the century and a half year old Cenotaph, without the simultaneous removal of the newer memorials in the Park, singles her and her speech out, which she asserts is viewpoint discrimination. She also asserts intense emotional injury in the act of "taking away of her family member's tombstone".

6. The City of St. Augustine ("City") is chartered as a sub-division of the State of Florida and as such must comply with the Laws of the State of Florida.

## FACTS

## THE PLAZA

7. The Plaza ("Plaza") a +/- 1 acre site was established in Spanish Colonial St. Augustine in approx. 1573 by Spanish Royal Ordinance as a central square for government, church and public use for the Spanish colony of "East Florida", and continues to this day as the oldest public forum in America.

8. For hundreds of years it has been the "Center" of the City, the scene of important ceremonies and gatherings.

9. The first public monument was erected in the Plaza in approx. 1813, to commemorate the Spanish people's constitution of 1812, the Constitution of Cadez. The Plaza was renamed the "Plaza de la Constitution" at that time.

10. Like the name of the City itself, the City's Public Forum legacy has for generations survived the clash of cultures over the many changes of hands and flags of the City.  For over a century and a half up until today, the Plaza has continued to be a forum for speeches, sermons, religious observances and public discussions.

11. It has and is being used as an 'open air church' with street preaching, Easter egg hunts, and weddings.  On October 31, 2018, a public prayer vigil was held for the victims of the

Pittsburgh shooting.  Each year the City hosts a Christmas tree lighting ceremony with Christmas carols played from the Gazebo.  On June 6, 2020, local churches hosted a unity prayer meeting in the Plaza after the death of George Floyd. See Exhibit "B".  All of these acts represent religious and/or political expression of speech.

12. The Plaza is the City's public "living room" where people meet and exchange ideas and views.  In 1964, during the Civil Rights movement, Rev. Dr. Martin Luther King Jr. preached, prayed, and protested in the Plaza. In 2015, the Plaza was the welcome mat for King Felipe VI and Queen Letizia of Spain, who greeted St. Augustinians, and later that year the site of the City's 450th public birthday cake cutting.  During WWII, funds were raised for the effort through sales of nails patrons could hammer into "Hitler's Coffin".  Protests organized by the "Woman's March" as well as by Ron Rawls, a proponent of removing the Cenotaph have been held in the Plaza on numerous occasions, most recently when Mr. Rawls threated the "safety" of the City, if the Cenotaph was not removed. All of these acts represent political expressions of speech.

13. The City of Saint Augustine is a historic city, dating to Spanish exploration in 1565, and is the oldest continuous city in America.  The City maintains other public monuments and memorials in the Plaza to historical events and individuals of significance including:  1) two bronze memorials relating to the 1960's  Civil Rights movement:  1. To the leader Dr. Andrew Young and 2. To the "footsoldiers"; 2)  The aforementioned 1813 "Constitution Monument" to the 1812 Spanish Constitution of Cadiz  (the City's oldest); and 3) several other war memorial in the Plaza to WWII, Korea, Vietnam, and to POWs of the American Revolution.

14. The Plaza is within in the boundaries of the St. Augustine Historic District ("District") which was approved as a listing on the National Register of Historic Places maintained by the US Department of the Interior under the auspices of the National Historic Preservation Act of 1966 (16 U.S.C 470). The Nomination specifically mention's the Plaza's two historic monuments: The Constitution Monument and the Cenotaph. Outside the boundaries of the Plaza, the City also maintains two bronze sculptures of Spanish explorers of importance in the City's history: Ponce de Leon and Pedro Menendez de Aviles.

15. The City of St. Augustine has a collection of ordinances and agreements that relate to protection of its Historic Resources.

## THE CENOTAPH

16. In 1879, a monument ("Cenotaph"),was erected in the Plaza. in a 20' x 20' plot in the center of the Plaza which was dedicated by the City for the purposes of erecting the Cenotaph.

17. The history of the Cenotaph began in 1866 when, one year after the end of the War Between the States, the ladies of St. Augustine ("Ladies") who had suffered the human loss of husbands, uncles, fathers, nephews, friends and neighbors commissioned a Cenotaph to be erected in the public dedicated to "Our Confederate Dead.'"

18. The Ladies erected a similar Cenotaph on private Church property in 1872, but were able to reconstruct the Cenotaph on its current site in 1879, after the Reconstruction occupation of the Union ended and the City of St. Augustine authorized and allowed construction of the new memorial in the Plaza.

19. The Cenotaph is 30' obelisk, square at the base with two marble riser foundations comprising thee levels. It was hand made on site of brick and coquina stucco by Joseph Llambias, whose

brother was honored on the Cenotaph, in a classical artful architectural style similar to the Constitution Monument, but making it artfully and architecturally unique.  It is surrounded with coquina concrete protective posts with heavy chain fencing, and historic cannons. See Exhibit "C".

20. The Ladies imbued the Cenotaph with  Honorific Memorial speech combing religious, art and poetical elements and a memorial message through the design of the structure and its embellishments including:  1) three levels with architectural insets on two levels, 2) each level adorned with marble carved tablets that include including poetry, artistic shields, ornately carved Latin crosses, a dedication plaque and 3) two plaques carved with the names of the forty four (44) "Dead" memorialized by the Cenotaph.  One of the inscriptions reads "Our Dead, In Memoriam, our Loved Ones Who gave up Their Lives in the service of The Confederate States".

21. The casualties commemorated on the Cenotaph included members of "The St. Augustine Blues" ("Blues") a militia group of local men and boys, organized in 1860 and mustered in to Florida service, designated the "B" Company of Florida's 3rd Infantry, as well as to others who would serve in other units.  The Blues was multi-racial, multi-ethnic, multi-sectarian group comprising descendants of northern and southern Europe, including Spain, Minorca and Italy.  The Blues' muster roll included three known St. Augustinians of African ancestry: Isaac Papino, Anthony Welters and Emanuel Osborne.  Though initially assigned locally, the Blues were re-assigned on front battle lines far from St. Augustine.  The final resting place of many the honorees are near far away battlefields, or known only to God.

22. Upon completion, the Ladies abided in the knowledge that the Plaza Cenotaph with its memorial message would emanate into posterity and for nearly a century and a half, the

Cenotaph has been a prominent feature of the City's civic landscape, and has silently emanated its honorific and other expressive speech to generations of residents, visitors, workers, and the endless parade of historical tourists who pass by or are brought to it as part of a historical tour of the ancient city and who pause to view and consider it, or who read about it in promotional literature.

**RECENT EVENTS**

23. Beginning in 2015, a wave of removals of historical military monuments and memorials, particularly relating to the Southern participation in the War erupted in America, which has since expanded to include other American historical figures including Spanish explorers, and reaches worldwide.

24. On October 22, 2017, rather than remove the Cenotaph, the historic City of St. Augustine, decided, rather than removing his historic Plaza Cenotaph, to add "context" to it. A Contextualization Committee ("Committee") was formed to recommend the exact form and wording ("Contextualization Plan" or "Plan"). Those selected for the Committee members were hand-picked by City Manager John Regan and included an academic, Michael Butler, known to be hostile to Southern history, who during the course of Committee meetings, aggressively asserted himself insisting that the term "white supremacy" be included in the Plan. No pro-Southern committee members were appointed thereby discriminating against their viewpoint.

25. On July 9, 2018 the City adopted the Plan after a presentation by said academic. The only City Commissioner opposed to the Plan was Mayor Nancy Shaver who objected to inclusion of the

term "white supremacy".  During the meeting, City Attorney Lopez was questioned if the City's Ordinance Section 22-9 relating to Monuments and Memorials, did not apply, and Ms. Lopez retorted saying that "The City could do anything they wanted [to do]".  Mr. Edgerton made a request, but was prevented from speaking to the Commission.

26. The contextualization materialized on July 9, 2018 manifested in 'footstones' abutting the Cenotaph's base encroaching on the Cenotaph's plot, bringing much emotional anguish and pain to Mr. Edgerton when he learned of it, and again when he witnessed it for himself.

27. On June 22, 2020, the City again took up the issue of the Cenotaph and this time decided by a narrow margin (3-2), to unilaterally remove the Cenotaph 'into storage' as a new location had not been identified, and despite its own historic preservation ordinances that were enacted to protect the City's historic assets.  There was no discussion of the City's historic preservation ordinances and laws, or of possible civil rights violation of affected parties.  Only that the Cenotaph was "offensive".  In casting the deciding vote, Vice Mayor Freemen said that 'none of her black friends" wanted to keep the Cenotaph in place.   There was, however, discussion of the fragility of the Cenotaph: Commissioner John Valdes, himself a professional contractor involved with historical structures, reminded his colleagues that the Cenotaph would not withstand a move.

28. Immediately following the June 22, 2020 decision, construction fencing was installed around the Cenotaph and pre-cut plywood was installed on the Cenotaph's faces which blocked from view the Latin Crosses and the names of the Cenotaphs honorees.

29. As revealed by Public Records request, the next day, the City, under 'emergency' powers, circumvented its own contracting process to execute a removal contract with LaRue House Movers & Sons, Inc.   This firm subsequently withdrew.

30. On Monday, July 25, 2020 the City allowed access to the Cenotaph to an unidentified contractor, believed to be a second contractor, Jeremy Patterson of Patterson Structural Moving and Shoring, LLC.

31. A Public records request has uncovered a proposal to the City from Patterson Structural Moving and Shoring, LLC, ("Patterson") to "move the monument" stating it "May need to be separated into 2 or more pieces to complete the move."

32. On Friday, August 14, 2020, Patterson arrived on site with heavy equipment to begin removing the Cenotaph from the Plaza and the process is continuing.

## COUNT 1

### CITY'S DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

33. The City of St. Augustine can be held liable under 42 U.S.C. § 1983 for deprivation of a Federal right which results from a policy or action of the local government's legislative body or of those local officials whose acts may fairly be those of the municipality.  Monell v. Department of Social Serv., 436 U.S. 658 (1978).

34. All Plaintiffs allege the City violated their civil rights and acted under color of  law in violation of 42 U.S.C. § 1983 when they acted to contextualize and later remove the Plaza Cenotaph.

35. Plaintiffs allege physical emotional, aesthetic, economic and reputational injury through the act of removal of the Cenotaph.

## COUNT 2

## VIOLATION OF EQUAL PROTECTION UNDER THE 14th AMENDMENT

36. Plaintiffs allege the City acted in violation of the Equal Protection clause under the 14th Amendment when they acted to contextualize and later remove only the Plaza Cenotaph and no other monuments or memorials in the Plaza de la Constitution or on other City property, singling their memorial out for contextualization and removal based on discrimination against the content of its message.

37. Plaintiffs allege viewpoint discrimination by the City's contextualization and removal of he Plaza Cenotaph, which was the only monument expressing their specific speech, both political and religious expressions.


## COUNT 3

## CITY VIOLATION OF CONSTITUTIONAL RIGHTS UNDER THE UNITED STATES CONSTITUTION IN CENOTAPH REMOVAL

38. **Free Exercise of Religion –** Plaintiffs allege prohibition of free exercise of their religious beliefs to pay memorial respects to their dead family members in the location where it has been done by generations, and where they wish to continue doing by laying wreaths and praying at the Cenotaph. The City's act of removal of the Cenotaph from the Public Square denies the Plaintiffs their religious freedom.

39. **Freedom of Speech –** Plaintiffs allege violation of speech and expression through the irreversible removal of the Historic Plaza de la Constitution "Our Dead" Cenotaph. ("Cenotaph"). The inability to publicly mourn, place memorial wreaths and flowers, as plaintiffs have done and wish to continue to do is being suppressed. The ability of plaintiffs to state "this is a

tombstone for my family, placed in the Plaza" and "this monument is an integrated monument",

and "it represents people who look like me", and "St. Augustine honors my family who died

here" is being eliminated.

## CITY VIOLATION OF CONSTITUTIONAL RIGHTS UNDER THE UNITED STATES CONSTITUTION THROUGH CENOTAPH CONTEXTUALIZTION

40. **Free Exercise of Religion –** Plaintiffs allege prohibition of free exercise of their religious

beliefs to pay memorial respects, without defamatory attributions to the reputation of their

dead family members, and by extension themselves,  in the location as has been done by

generations, and which they wish to continue doing, by the City's act of contextualizing the

Cenotaph.

41. **Freedom of Expression –** Plaintiff Edgerton further alleges that the City of St. Augustine's

Contextualization of the Plaza de la Constitution Cenotaph violated and suppressed his

Constitutionally protected civil liberties and 1st Amendment protected freedom of speech

and expression through contextualization of the Cenotaph and, until such Contextualization is

removed, continues to do so.  He alleges the Contextualization contains malevolent lies that

the City has imposed upon the monument, which cannot be substantiated, as it is not a "white

supremacy' monument, but instead, just the opposite, an "integrated monument".

## CONCLUSION

42.  Plaintiffs have proper standing, jurisdiction, and venue to appear before the Court and request

relief.

43. The United States, through this Court, has an interest in protecting the Constitutional rights of its citizenry including Speech and Religious expression.  Recognition of these God given natural rights is what is so exceptional about America in world history.  This Court has jurisdiction over the protection of Plaintiffs rights and they humbly pray that they will be protected.

    a. Free expression of religion is one of the fundamental underpinnings of our Constitution. A Commandment given to believers in the Judeo-Christian tradition is to "Honor thy Father and Mother".  The Natural Right of free speech of an individual is a fundamental underpinning of our Nation, codified in our founding documents and must be protected.  Non-controversial speech needs less protection. Through controversy, knowledge and understanding is gained.  Expression and speech must not and cannot be allowed to be censored by the State.

    b. Paying respects at a tomb, even an empty one, like the tomb of the Unknown Soldier at Arlington National Cemetery, is a method of free exercise of the Honorific Commandment.  One method of free speech is to publicly pay respects at a grave site, rather than in a remote location. Plaintiffs' free expression and free exercise through honorific Religious speech and expression is one important Honorific method, recognized in the Constitution as religious freedom. The Government speech of 'Re-meaning the Cenotaph by "Contextualization"' stifles and censors the protected Honorific Speech of the Plaintiff which emanates from the Cenotaph as well as those expressed by Plaintiffs, thus infringing of the free expression.  This is a particularly egregious case of speech suppression because the City's "Context", was placed within the Cenotaph's designated plot, similar to putting a sign reading

"Here lies a racist" atop a grave in a cemetery to be discovered, but unmovable by, family paying respects at the grave.

c.  The Free Speech Clause of the First Amendment is especially important for protecting unpopular speech; popular speech generally needs no protection. This Cenotaph may be a lone voice of dissent, representing speech that is unpopular. Mr. Edgerton speaks an unpopular message beside a monument of an unpopular history in an open air museum which facilitates his speech. This speech is significantly less meaningful in any other forums. The City seeks to suppress and eliminate it altogether.  He, together with the Cenotaph are a nagging reminder to the politically-correct orthodox and those who blindly adhere to it, that there was a time when people thought differently.  May this voice not be silenced, either by the vandal's sledgehammer or by the official's crane. No society can long endure that teaches its children to hate their ancestors and be ashamed of their heritage.  Erasing our heritage from public view is "profoundly disrespectful" to the informed public at large.   Furthermore, especially in a public forum, singling out monuments that honor Confederate dead constitutes both content and viewpoint discrimination and sends a "message of exclusion" to those who honor their Southern heritage by telling them they "are outsiders, not full members of the political community." *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573 at 605 (1989) (O'Connor, J., concurring in part and concurring in judgment)).

d.  Plaintiff Edgerton argues that the Cenotaph's Emanating Speech, even if not granted Standing by this Court, is protected as Constitutional Speech based on the "History and Tradition" aspects of <u>American Legion v. American Humanists *(Am.</u>

_Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067 (2019)_, based on its century and a half old Honorific Speech in the Plaza. In _Pleasant Grove City v. Summum, 555 U.S. 460, 129 S. Ct. 1125 (2009)_ the presumptive permanence of a monument in a park, as opposed to other forms of constitutionally-protected speech, established the Doctrine providing that the City must "take some care in accepting donated monuments".

e. The fairly new doctrine of "Government Speech" does not apply in this case for several reasons:

 (1). The doctrine was developed in _Pleasant Grove City v. Summum, 555 U.S. 460, 129 S. Ct. 1125 (2009)_ , more than a century after the Cenotaph was erected and dedicated.

 (2) The doctrine applies to a governmental entity accepting or erecting a new monument, not to a governmental entity removing a monument that had been erected long before the doctrine was articulated.

 (3) One of the reasons for the _Summum_ government speech doctrine was that when monuments are accepted and dedicated and erected,  they are presumed to be durable and permanent.

 (4) All public parks are not the same, just as all public sidewalks are not the same. _United States v. Kokinda,_ 497 U.S. 720 (1990) (sidewalk which led only from the parking area to the front door of a post office and which was constructed solely for persons engaged in postal business was not a public forum).  In contrast to the city park in Pleasant Grove which accepted only monuments for specified purposes, the history of the Plaza de la Constitution demonstrates that it is and always has been the

quintessential traditional public forum with religious activities, political speech and all manners of public engagement.

This case is distinguished from Summum in that the City of Pleasant Grove was presented with the opportunity to accept a new monument being offered to its new park. That is not the case, here. The Cenotaph has been speaking in the Plaza for a century and a half.   If the judiciary construes Summum to apply to an existing monument in an existing park, there is no 'permanency' that was alleged as the reason of the Summum decision and the doctrine that created it is unjustified.  All municipal parks are not equal.  A long standing traditional Public Forum is not the same as a newly erected sports park, or recreational venue or even a veterans park, which is open to the public at restricted hours of operation.   The Pubic Forum is an open forum. Governments create a designated public forum when they allow full discourse.  Limited forums, such as municipal meeting rooms, are nonpublic forums designated by the government to certain groups or topics.   Traditional public forums, like the one established centuries ago, and a public forum when the Cenotaph was established, cannot be changed to nonpublic forums after the fact and 'evict' the free speech granted to a Cenotaph and expected by those who use it for free expression and speech.

44. This Federal Court has the authority to grant emergency injunctive relief to Plaintiff who are concerned that the Defendant may move swiftly and unilaterally to eradicate Plaintiff's rights altogether by removing the 140 year old Plaza Cenotaph. In so doing, the Plaintiffs will suffer

irreparable harm by the removal and potential destruction of the "Our Dead" Plaza de la Constitucion Cenotaph if emergency injunctive relief is not immediately granted.

## PRAYER FOR RELIEF

45. For these reasons, Plaintiffs pray that the Court grant the following Relief:

a) Enter a temporary injunction prohibiting the City and/or any agents, contractors or authorized parties from altering the Cenotaph or its visibility or access in any way, including removing the construction fencing and hording;

b) Keep the temporary injunction in place as a permanent injunction until the Courts final decision on this case, with minimal bond; as Plaintiffs are not asking for monetary relief; and

c) Make a declaratory judgment that the removal of the Plaza Cenotaph violates the Civil Liberties and Constitutional Rights of Plaintiffs and Order that City refrain from attempting to do so in the future;

d) Make a declaratory judgment that the 'contextualization' of the Plaza Cenotaph violates the Civil Liberties and Constitutional Rights of Plaintiffs and Order that City remove the previously installed "Contextualization" footstones on the Cenotaph and refrain from doing so in any way in the future;

e) Enter judgment for Plaintiff;

f) Award costs of suit to Plaintiff; and

g) Award attorney and expert's fees pursuant to 42 U.S.C. §1988, 28 U.S.C. §2201.

h) If the Cenotaph has already been removed before this Court has decided this matter, plaintiffs ask money damages for the deprivation and violation of their free speech and free exercise of religion rights and for an order directing the City to replace the Cenotaph or, if that is not possible, erect a similar edifice acceptable to Plaintiffs.

i)   Grant such other relief as the nature of the case and Court deem just and proper.

Plaintiffs further ask the Court for any and all relief to which Plaintiffs may show they
are entitled.

Respectfully submitted this 19th day of August , 2020.

By: _David R. Mc Callister_

DAVID RHODES MCCALLISTER,
Trial Counsel, for all Plaintiffs
Florida Bar No. 724637
David R. McCallister, Attorney at Law
PO Box 7343, Wesley Chapel, FL 33545
Tel. (813) 973-4319
Fax (352) 260-0157
E-mail davidmccallister@hotmail.com

STATE OF FLORIDA

PASCO COUNTY

<u>AFFIDAVIT OF DAVID RHODES MCCALLISTER</u>

Before me, the undersigned notary, on this day personally appeared David Rhodes McCallister affiant, a person whose identity is known to me.  After I administered an oath, affiant testified as follows:

1. My name is David Rhodes McCallister.  I am competent to make this affidavit.  The facts stated in the Complaint for Declaratory and Injunctive Relief are within my personal knowledge and are true and correct.

2. On August 12, 2020, the City and its agents began the physical removal of the Cenotaph in the Plaza of the City of St. Augustine.

3. I have personally seen the fence and hoarding around the Cenotaph, which blocks access and view if the monument in the City of St. Augustine.

4. I have seen video of excavation at the base of the monument.

5. I heard , during the live transmission of the commission meeting on June 22, 2020, that the City of St. Augustine decided to permanently remove the monument and that removal is imminent.

6. The City Commission discussed at the June 22, 2020 the likelihood that the monument would not survive relocation.

7. I have seen and participated in expressions of free and political speech and religious prayers at the Cenotaph located in the City of St. Augustine.

8. I have personally witnessed HK Edgerton and Jill Pacetti, Plaintiffs, at the monument praying and speaking.

9. I have read news articles, history books, talked with witnesses, and read and heard statements made by the parties in this matter.


_David R. Mc Callister_

DAVID R. MCCALLISTER

SWORN TO and SUBSCRIBED before me by David Rhodes McCallister on August 19, 2020.


BRANDIE K HUNTER
MY COMMISSION # GG 090189
EXPIRES: June 6, 2021
Bonded Thru Budget Notary Services

_Brandie K. Hunter_

Notary Public in and for

The State of Florida

**EXHIBIT "A"**



Picture of HK Edgerton kneeling/praying at the monument taken January 2020.

**EXHIBIT "B"**



Cenotaph at George Floyd Prayer Vigil, June 6, 2020

**EXHIBIT "C"**

